IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANKIE L. McCOY, SR.,      *
      Plaintiff,
  v.      *      CIVIL ACTION NO. WDQ-10-1583

J. MICHAEL STOUFFER, et al.,      *
      Defendants.
        ***

## MEMORANDUM

Pending is the motion to dismiss, or in the alternative, for summary judgment[1] of

Defendants Gary D. Maynard, Secretary of Department of Public Safety and Correctional

Services (DPSCS), J. Michael Stouffer, Deputy Secretary of Operations, William O. Filbert, Jr.,

Acting Assistant Commissioner/former Warden of Baltimore City Detention Center (BCDC), J.

Philip Morgan, former Warden of Western Correctional Institution (WCI) and current Warden of

Maryland Correctional Training Center (MCTC), Gregg L. Hershberger, Warden of Roxbury

Correctional Institution (RCI), Robert Koppel, Warden of former Maryland Correctional

Adjustment Center (MCAC), currently Chesapeake Detention Facility (CDF), Dayena Corcoran,

Warden of Maryland Correctional Institution- Jessup (MCI-J), Lt. Timothy Munson (RCI), Lt.

Gary Winters (RCI), CO II Kenneth L. McCusker (WCI), CO Sgt. Keith M. Toothaker (WCI),

CO Captain Marc V. Whiteside (WCI) and CO Lt. Ronald J. Gordon's (WCI). ECF No. 30. The

Plaintiff has responded. ECF Nos. 32, 37, 39 & 40. No hearing is necessary. *See* Local Rule

---

[1] Defendants Sgt. Bowser and R. White have not been served with the Complaint. For the reasons that
follow, the Plaintiff's Complaint against them will be dismissed.

1

105.6 (D. Md. 2011). For the reasons stated below, the dispositive motion filed by the Defendants will be granted.[2]

## Background

The Amended Complaint alleges that the Plaintiff has been denied adequate medical care because medical "accommodations" he requires were not provided to him at three different institutions, MCI-J, RCI, and WCI. He has sued DPSCS administrators and former and current administrators and staff at the institutions under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act. ECF Nos. 1 & 5.

The Plaintiff alleges a conspiracy among Division of Correction ("DOC") staff to punish and retaliate against him by transferring him throughout the DOC and to a higher security facility because of his Requests for Administrative Remedies (ARPs) and litigation in the state and federal courts. *Id.*

The majority of the claims here arose in 2009 and 2010. The Plaintiff alleges that while housed at MCI-J he awaited follow-up on recommendations made by medical staff. He spoke

---

[2] The Plaintiff's Motion to Oppose Any Further Delays (ECF No. 26) will be denied as moot. The Court has also received the Plaintiff's Motions for Discovery (ECF Nos. 33, 35 & 36) and Motion for Appointment of Counsel. ECF No. 34.

Unless otherwise ordered by the Court, or agreed to by the parties, discovery may not commence until a scheduling order has been issued by this Court. *See* Local Rule 104.4 (D. Md. 2011). Discovery is denied.

As the Plaintiff is aware, a federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1), is discretionary; appointing counsel may be considered when an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also, Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). When a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed. *Id.* Upon consideration of the filings by the Plaintiff, the Court finds that he is capable of articulating the legal and factual basis of his claims or securing meaningful assistance in doing so. The issues pending before the Court are not unduly complicated. There are no exceptional circumstances that would warrant the appointment of an attorney to represent the Plaintiff under §1915(e)(1).

Plaintiff's Motion to Supplement the Opposition Memorandum of Facts (ECF No. 37) will be granted. To the extent new allegations not contained in his Complaint as supplemented are raised in any of the Plaintiff's oppositions to the dispositive motion, those claims are not properly before the Court and will not be considered.

2

with Warden Corcoran and filed ARPs on August 6, 2009 and December 17, 2009, concerning his medical care and the lack of medical accommodations or response to medical recommendations. He states that recommendations to repair/replace his left arm brace, for knee surgery, an MRI, and orthopedic shoes were delayed. He claims that he was retaliated against by being transferred to WCI in Cumberland, Maryland based upon false charges; the transfer took him away from his medical providers in the Baltimore/Jessup region.

The Plaintiff states that upon his arrival at WCI he repeatedly requested the previously recommended medical accommodations, including single cell status, access to a handicap cell and daily showers with a shower chair. He alleges he was denied access to his neurologist for three and a half months. He further alleges he was placed on administrative segregation for five days without access to his legal materials and that he fell on the stairs climbing to his housing unit. *Id.*

The Plaintiff alleges that he was held at MCAC in a cell with broken windows during January and February, 2010 and that his medical needs were denied during this time.

The Plaintiff alleges that in April 2010 he was transferred to RCI where his medical recommendations continued to be ignored. He was again denied access to legal materials and a radio that had previously been approved by custodial staff. Plaintiff alleges property officers Munson and Bowser refused to return the items, and Winters confiscated his adjustable cane. *Id.*

The Plaintiff alleges he was denied use of the hospital elevator from July 22, 2010 through September 30, 2010. He also alleges that between January 1, 2011 and August 9, 2011, the Defendants failed to provide recommended medical accommodations, resulting in his falling on multiple occasions and suffering additional injuries. Specifically, the Plaintiff alleges Morgan, Whiteside, Gordon, Toothaker, and McCusker all deprived him of daily hot showers and medical housing, specifically single cell status with a seat and railing. The Plaintiff alleges Winters

3

confiscated Plaintiff's adjustable cane, thus interfering with his medical recommendations and needs. Plaintiff states that the confiscation directly led to his falling on three occasions and caused concussions and damage to his face, neck, jaw, hands, legs and knees. The cane was returned to him on November 28, 2010. ECF No. 5.

The Plaintiff claims that Stouffer, Morgan and Hershberger "harbor[ed] a discriminatory animus [and] denied access to (TTY) phone service programs or activities for hearing impaired inmates." *Id.* Additionally, the Plaintiff alleges that while housed at WCI his hearing impairment worsened from the physical conditions of his incarceration. He states that he was unable to hear announcements over the intercom system and was denied TTY access, which caused him to miss meals, announcements, and other activities. *Id.*

The Defendants dispute the Plaintiff's allegations in certain respects and clarify the facts in others.[3] Previously, the Plaintiff filed suit against his medical providers for denial of medical care during the period at issue in this case. He alleged, among other things, that his medical care had been delayed and interrupted. *See McCoy v. Correctional Medical Service, Inc.*, WDQ-10-1481 (D. Md), ECF No. 60. Recitation of the facts and legal conclusions found in that case are relevant and follow:

> The Plaintiff is a Maryland State inmate who suffers from cervical spondylosis, lumbar degenerative disc disease, bunions on his right foot, corns on his left foot, "drop foot", and temporomandibular joint disease ("TMJ"). The Plaintiff also uses an arm brace for left forearm pain. ECF Nos. 1, 21 & 35. The Plaintiff alleges he has been denied follow-up care ordered by physicians. He alleges that he has been denied an MRI for his right knee injury; follow- up with a podiatrist for surgery on his right foot bunion, repair of his arm brace, and referral to a dental specialist for TMJ. He alleges that the referrals were pending when he was transferred for retaliatory reasons to the Western Correctional Institution. He also alleges that Christy Whitehair confiscated his medically prescribed adjustable cane and being forced to travel in a bus without toilet facilities from the Western

---

[3] By way of background, the Plaintiff, currently incarcerated at MCI-J, has received no infractions since May 8, 1999 and has been designated as a medium security status since November 13, 2002. ECF No. 30, Exs. 1-3.

Maryland area to the Baltimore Metropolitan area for court appearances has caused him to soil himself. ECF No. 1.
****

## TMJ

The Plaintiff received physical therapy for TMJ from March 9-23, 2009. Then he was discharged from physical therapy with instructions for exercises he could continue independently. ECF No. 35, Exs. G & H, p. 2-3, 7-8. On May 9, 2009, the Plaintiff was seen by Dr. Ayalew for follow-up for his TMJ. Then the Plaintiff reported he had been doing well with the physical therapy and was experiencing no pain. Dr. Ayalew submitted a Consultation Request for Plaintiff to be evaluated by an oro-maxillofacial surgery specialist ("OMFS") at the University of Maryland Medical System ("UMMS"). *Id.*, p. 8A-9.

The consultation request was approved and on May 21, 2009, the Plaintiff was evaluated by Robin Yang, DDS, at UMMS. *Id.* p. 10. Dr. Yang noted that the Plaintiff was not a candidate for TMJ surgery. Dr. Yang prescribed a muscle relaxant, soft diet, continued physical therapy, and ice or hot compresses as tolerated for comfort. The Plaintiff was again evaluated by Dr. Ayalew who reviewed Dr. Yang's recommendations, continued the Plaintiff's prescription for a muscle relaxer, and submitted a Consultation Request for him to be evaluated by Dr. Grace, a TMJ specialist. *Id.*, p. 9-9A.

The Plaintiff was again evaluated by Dr. Ayalew on June 26, 2009. The Plaintiff did not complain of jaw pain. He advised Ayalew that he was using ice as needed, and his physical therapy had been completed. His prescription for the muscle relaxer was continued. *Id.*, p. 15-16. He reported to Dr. Ayalew on July 15, 2009 that he had gone to UMMS to see the oral surgeon but was told he would be rescheduled. *Id.*, p. 20. He was next seen by Ayalew on October 22, 2009. He had no complaints of jaw pain and did not have any difficulty chewing or eating. His prescription was continued. *Id.*, p. 31.

On November 5, 2009, the Plaintiff was evaluated by an OMFS at UMMS. The Plaintiff advised that he continued to have pain in his left TMJ, and his condition had not improved over the past eight years. He advised the doctor that he followed Dr. Yang's recommendations which resulted in some relief. The specialist recommended that the Plaintiff follow-up with a dentist for further treatment of his TMJ. Plaintiff's soft diet, heat and ice, muscle relaxant, and physical therapy were continued. *Id.*, p. 37.

The Plaintiff was next evaluated on December 11, 2009, by Dr. Ayalew. His muscle relaxant was continued, and Ayalew submitted a Consultation Request form for him to be seen by a TMJ disorder specialist. *Id.*, Ex. G.

5

On April 5, 2010, the Plaintiff was examined by Alan Graves, DDS. Dr. Graves submitted a Consultation Request form for the Plaintiff to follow up with an OMFS for his chronic pain. Graves noted a CT scan had been requested but had not been taken because of Plaintiff's transfer to WCI. *Id.*, p. 54.

The Plaintiff was evaluated by Dr. Joubert on April 19, 2010, in the Chronic Care Clinic ("CCC"). He did not complain about TMJ pain during that visit. Joubert prescribed Extra Strength Tylenol for Plaintiff's back pain. *Id.*, p. 55.

The Plaintiff's TMJ has been conservatively managed. He received pain relief from the combination of muscle relaxant, independent physical therapy, ice and heat, and soft diet. He is not a candidate for surgery. He has suffered some delay in having his condition reviewed by outside experts because of the retirement of certain experts in the field and other scheduling difficulties. Plaintiff has provided a copy of a medical note dated June 10, 2011 indicating that a new consultation request for the Plaintiff's TMJ has been generated. ECF No. 56, Attachment. On this record, no reasonable fact finder could find that the Defendants have been deliberately indifferent to the Plaintiff's medical needs for his TMJ.

Left Arm Brace

On June 1, 2009, the Plaintiff requested a new sleeve for his arm brace. Dr. Ayalew noted that a new sleeve would be requested from the dispensary. *Id.*, p. 14. When the Plaintiff next saw Ayalew, on July 15, 2009, he reported that he had not received the new sleeve. *Id.*, p. 20. The Plaintiff complained about the padding in his arm brace to Zygmunt Bogucki, P.A. on August 27, 2009, noting that the brace was pressing into his soft tissue. Bogucki referred him to Ayalew for evaluation of his brace. *Id.*, p. 24-25. Ayalew saw the Plaintiff on October 14, 2009. The Plaintiff advised Ayalew that the brace pads were worn out and causing skin irritation. Ayalew noted that he would refer Plaintiff to The Brace Shop. *Id.*, p. 29-30.

On January 17, 2010, the Plaintiff was transferred to the Western Correctional Institution. He had not been taken to The Brace Shop before his transfer. On February 28, 2010, he was evaluated by Nurse Trenum for complaints of neck spasm down his left arm. Trenum noted that the Plaintiff was not wearing his brace during the visit. The Plaintiff advised Trenum that he had removed the brace that morning. Trenum noted he was able to move his arm. The Plaintiff described his pain level as 8 out of 10, with ten the most severe. He advised that he had not taken any medication for the pain, and showers helped relieve the pain and spasms. His prescriptions for muscle relaxant and Extra Strength Tylenol were continued. *Id.*, p. 51.

In May 2010, the Plaintiff was transferred to the Roxbury Correctional Institution. On May 12, 2010, he was evaluated by Nurse King who noted that he had a left arm brace, right leg brace, walker and prosthetic shoes to use as needed. *Id.*, p. 58.

6

On June 18, 2010, the Plaintiff was evaluated by Kevin McDonald, P.A. because Plaintiff's left arm brace had a worn sleeve which had begun to abrade Plaintiff's left elbow. The P.A. noted that a consultation request for the brace was pending. He referred the Plaintiff to the physician. *Id.*, p. 62-63.

On November 15, 2010, Dr. Temesgen submitted a Consultation Request form for Maryland Orthotics and Prosthetics, Inc. ("MOPI") to have the Plaintiff's arm brace repaired. Plaintiff went to MOPI on January 3, 2011 and the necessary repairs were made. *Id.,* Exs. G & H, p. 81-82; ECF No. 38, Attachments. The Plaintiff has provided photographs which show bruising of his inner elbow. ECF Nos. 38 & 55, Attachments.

The Court notes that it took over one year for Plaintiff to be supplied a new arm brace. During that time, the Plaintiff refused the services of the orthopedic specialty shop to which he had been referred and was transferred amongst state prison facilities, adding to the disruption in his care. Although the Court is mindful that the lack of padding in Plaintiff's arm brace made the brace uncomfortable and caused bruising to Plaintiff arm, there is no evidence that delay in repair of the brace or receipt of a new brace seriously harmed Plaintiff or was attributable to the indifference of any of the named Defendants. Plaintiff's own actions caused, in part, the delay of which he now complains. Defendants worked to secure repair or replacement of his arm brace.

## Knee Pain

On August 27, 2009, Plaintiff was evaluated by P.A. Bogucki for knee pain. The Plaintiff described the pain as mild, indicating he suffered from the pain for six years. He indicated the pain was worse with walking but improved with rest. Bogucki's examination showed tenderness of the knee with mild pain upon motion. *Id.*, p. 24-25. He was advised to return for follow-up if his condition did not improve within thirty days. *Id.* The Plaintiff was again examined by Bogucki for continued knee pain on September 17, 2009. Bogucki noted that the Plaintiff had mild pain which worsened with walking and improved with rest. Bogucki ordered an x-ray of the Plaintiff's right knee. *Id.*, p. 26-27.

Dr. Ayalew examined the Plaintiff on October 22, 2009. He reported the pain was one out of ten. Ayalew observed that the Plaintiff could walk without difficulty or instability. The Plaintiff advised Ayalew that he wished to see an orthopedic surgeon. Ayalew advised him that as his range of motion was stable and his activities of daily living were not effected by the knee pain, there was no need to refer him to an orthopedic surgeon. Ayalew also reviewed the Plaintiff's x-rays which showed no acute fracture, dislocation or subluxation. *Id.*, p. 28. An x-ray showed two fragments in the region of the tibial tubercle which were described as most likely congenital variants. *Id.* Ayalew determined that a referral to an orthopedist was not necessary then. *Id.*, p. 31.

7

The Plaintiff was again seen by Ayalew on November 13, 2009. Plaintiff showed Ayalew an MRI report performed on October 27, 1995. Ayalew noted that the MRI showed a calcified tubercle from a 1994 fracture and that nothing was done for Plaintiff's knee when he fractured it in 1994. The Plaintiff again requested to see an orthopedic surgeon at UMMS. Ayalew referred him to an onsite orthopedic surgeon. *Id.*, p. 39-41.

The Plaintiff was evaluated by Lawrence Manning, M.D., on December 1, 2009. Dr. Manning noted that Plaintiff had marked enlargement of the tibial tubercle and internal derangement of the right knee. Dr. Manning recommended a repeat MRI and a follow-up appointment after the MRI had been taken. Dr. Manning also recommended high topped shoes and orthopedic shoes. *Id.*, p. 42.

The Plaintiff returned to Ayalew in the Chronic Care Clinic on December 11, 2009. Ayalew noted that the Plaintiff was not then complaining of pain and could bear weight and walk easily. Ayalew noted Dr. Manning's recommendations and submitted a Consultation Request form for an MRI to be performed at Bon Secours Hospital ("BSH"). *Id.*, p. 43-46, 89-92.

On February 3, 2010, Dr. Ottey, at WCI, noted that the Plaintiff advised him that he was to have the MRI before his follow-up visit with Dr. Manning. *Id.*, p. 48. The Plaintiff was seen by Nurse Sparks on February 22, 2010, who noted that the Plaintiff was very demanding and manipulative and claimed he was "legally owed a transfer to Baltimore where he can be better cared for." *Id.*, p. 50.

There are no notes of the Plaintiff's complaint about pain in his knee again until October 10, 2010, when he was again incarcerated at MCI-J. *Id.*, p. 74. At that time he submitted a Sick Call Slip and advised P.A. Bogucki that an MRI had recently been performed. Bogucki noted that he would follow-up with BSH to secure the MRI report. As of the filing of the motion for summary judgment the Defendants report that the Plaintiff had not complained of knee pain. *Id.*, Ex. G. In Plaintiff's supplement to his opposition to the dispositive motion, he provides additional medical records. He provides a radiology report dated October 11, 2010. On that date an MRI was performed on the Plaintiff's knee. The MRI revealed focal chondoris with a small area of full thickness cartilage loss at the lateral margin of the medial femoral condule; patellar baja with embedded ossicle; and no meniscal or ligament tear. A note from Dr. Yonas Sisay dated June 10, 2011, delineates the Plaintiff's multiple medical problems but makes no reference to his knee. It does indicate that Dr. Sisay was awaiting the report from an orthopedic consultation held on May 15, 2011. The Plaintiff has also provided a physical therapy note dated September 1, 2011. The note states that the Plaintiff provided the physical therapy "notes and MRI dictation [which indicate patient] has been recommended surgery for right knee." ECF No. 56.

The Plaintiff has failed to demonstrate that he has been denied medical care. The medical records and the affidavit of Kasahun Temesgen, M.D. show that the

Plaintiff has received medical care. Moreover, the records demonstrate that the Plaintiff received appropriate care regarding his knee pain and is now awaiting surgery. His unsupported allegations of denial of medical care are little more than a disagreement with the judgment of his health care providers. Such disagreement with his course of treatment is not a basis for relief. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975).

Foot Problems

On March 9, 2009, the Plaintiff complained of right foot pain around a bunion and in his heel. He described the pain as mild, made worse with walking and improved with rest. Bogucki examined him and noted that his foot was tender around the bunion and lateral heel area. *Id.*, Exs. G & H, p. 4-5. Bogucki directed him return for follow-up in 60 days if the condition worsened or failed to improve. On that date, an x-ray of the right heel was taken. It showed no evidence of heel spurs. *Id.*, p. 6. On May 28, 2009, the Plaintiff was again evaluated by Bogucki for complaints about the bunion on his right foot and corn on his left small toe. He indicated that the ailments caused difficulty when he walked and improved with rest. Bogucki noted that the Plaintiff had the bunion since 2004. He referred him to Dr. Ayalew for further evaluation. *Id.*, p. 11-12. The Plaintiff was seen by Dr. Ayalew on June 1, 2009. He reported difficulty walking and putting on shoes from the pain in his foot. Ayalew noted that the Plaintiff had a hammer toe malformation of his left fifth toe and his right fifth toe had been amputated for the same reason after conservative treatment had failed. The Plaintiff requested high top boots and complained that he had received high top tennis shoes instead. He advised Dr. Ayalew that he had refused the high top tennis shoes and sent them back to the vendor. Ayalew indicated he would refer Plaintiff to a podiatrist and request orthotic shoes. *Id.*, p. 13-14. When Plaintiff next saw Dr. Ayalew on June 26, 2009, the doctor noted that he was scheduled for referral for the footwear. *Id.*, p. 15.

The Plaintiff was evaluated by David B. Samuels, DPM at BSH on July 1, 2009. Dr. Samuels noted a corn on the fifth toe of his left foot, a bunion on the right foot, and right sided foot drop, for which the Plaintiff wore a brace. Dr. Samuels debrided Plaintiff's left fifth toe. He noted that he spoke with Plaintiff about possible surgical correction of the fifth toe of the left foot and bunion of the right foot which would require x-ray evaluation. Dr. Samuels also recommended that the Plaintiff receive new orthopedic shoes and high top tennis shoes. He directed the Plaintiff be seen for follow-up in six weeks. *Id.*, p. 17-19.

On July 15, 2009, the Plaintiff advised Dr. Ayalew that his toe had improved significantly since the debridement on July 1, 2009. *Id.*, p. 20. Ayalew noted that the Plaintiff's orthopedic shoes had been ordered. On July 29, 2009, Ayalew spoke with the Plaintiff. Ayalew advised him that Hanger Orthotics had sent a note that Plaintiff had refused services from them. The Plaintiff admitted he had

9

refused services, advising Ayalew that he had been sent to Hanger in the past, and did not want to see them; he wanted to go to another facility. *Id.*, p. 21.

On August 7, 2009, Ayalew submitted another consultation request for the Plaintiff to see a podiatrist for possible surgical correction of his left fifth toe and x-rays to assess same. *Id.*, p. 22. He again saw Ayalew on August 14 and October 22, 2009. He again refused to see Hanger for his shoes. *Id.*, p. 23 & 31. He was evaluated by a podiatrist at BSH on October 28, 2009. The podiatrist noted he had been using a bunion padded shield on his right foot which the Plaintiff reported had been helpful. The Plaintiff advised that he had no pain; he did report, however, that he favored his left foot when walking and had developed a corn on the dorsal aspect of the fifth toe. The doctor debrided the lesion on his left fifth toe and prescribed orthopedic shoes and high-topped sneakers. The podiatrist noted that he would re-evaluate the Plaintiff after he received the prescribed shoes to determine if the bunion or hammer toes were still bothering him. *Id.*, p. 33-35.

On November 6, 2009, Hanger sent the Plaintiff a letter advising him that they were terminating him as a patient and would no longer treat him. *Id.*, p. 38. Dr. Ayalew notified Plaintiff, on November 13, 2009, that when CMS found a new vendor that would treat him, he would be referred for shoes. The Plaintiff had no complaints about his foot at that time. *Id.*

He was incarcerated at WCI or RCI from January 22 to July 12, 2010. He was transferred back to MCI-J and, on August 27, 2010, a new Consultation Request form was submitted for him to follow up with a podiatrist. *Id.*, p. 71-72. He was evaluated by the podiatrist on November 10, 2010. *Id.*, p. 76. His left fifth toe was again debrided and it was again recommended he receive orthopedic shoes. The doctor recommended that the Plaintiff receive orthopedic shoes from Van Dyke and Bacon, a specialty shoe shop. He went to Van Dyke and Bacon on January 25, 2011, and was measured for the recommended shoes. *Id.*, Exs. G & H, p. 76-77, 81, 82. Plaintiff has provided evidence that at some time since the filing of the motions for summary judgment his orthopedic shoe was sent out for repair and the podiatrist recommended he try Neurontin as part of his treatment for foot pain. ECF No. 56, Attachment.

His receipt of new orthopedic shoes was delayed primarily because he had refused to accept the high top tennis shoes and then refused to be fitted by Hanger. The delay in receipt of the orthopedic shoes caused delays in follow-up with the podiatrist who indicated he would evaluate the Plaintiff further after he had received the orthopedic shoes to determine whether additional treatment would be required. The undisputed evidence is that Plaintiff's needs were not ignored, and he has suffered no identifiable injury as a result of any delay in providing the orthopedic shoes or follow-up with the podiatrist. There is no evidence that the delay was caused by a callous disregard for the Plaintiff's medical needs; rather, the Plaintiff was responsible for much of the delay. The Defendants are entitled to summary judgment on this claim.

10

### Back Pain

On June 4, 2010, Dr. Mennon submitted a Consultation Request for the Plaintiff to see a neurosurgeon for the previously diagnosed lumbar stenosis and cervical radiculopathy. He was scheduled to see the neurosurgeon on June 28, 2010, but refused to go without his medical records. Custody personnel refused to allow him to take his records with him. Dr. Mennon advised the Plaintiff that his records did not need to go with him to the appointment but the Plaintiff refused to go without them. *Id.*, p. 60-61, 64-65. The Plaintiff's refusal to go to the appointment without his medical records is the sole reason for the delay in medical services for Plaintiff's back. The medical staff had written requests that he be permitted to take his medical records with him to outside physician's appointments. Security staff declined to permit Plaintiff to do so. The medical staff do not control decisions of security.

The Plaintiff has provided additional medical records which indicate that on September 15, 2010 he was evaluated at UMMC in the neurosurgery department. It was recommended at that time that the Plaintiff undergo MRIs of his lumbar and cervical spine. On June 10, 2011, it was noted he was awaiting the scheduling of an open MRI of his spine due to Plaintiff's stated claustrophobia. The MRI was performed on July 20, 2011. As a result of the MRI, minimally, the Plaintiff was referred to physical therapy. It is not evident from the additional records provided by Plaintiff what, if any, additional treatments have been recommended regarding Plaintiff's neck and back pain. ECF No. 56.

### Plaintiff's cane

Plaintiff was housed at RCI from April 30, 2010 to July 7, 2010. The Plaintiff submitted six sick call slips during this time; none alleged that his cane had been confiscated. He was evaluated by medical staff at RCI on three occasions. *Id.*, Ex. H, p. 83- 88. There is no notation in his chart that he complained that his cane had been confiscated. Dr. Mennon's notes of May 19, 2010, indicate that the Plaintiff was permitted to use an adjustable cane and walker as needed. *Id.*, Ex. H, p. 58-59. Whitehair avers that she has no recollection of taking Plaintiff's cane and she would not have taken his cane unless instructed to do so by a physician who had found that the cane was no longer required. *Id.*, Ex. I. Documents submitted by the Plaintiff indicate that a metal walking cane was confiscated by Correctional Officer Winter on May 17, 2010, as contraband. ECF No. 29, Attachment. The record reflects that Nurse Whitehair did not confiscate his cane.

### Incontinence

On March 4, 2010, the Plaintiff complained of urinary and fecal incontinence. He advised Dr. Mickel that he did not usually experience incontinence, but he

> experienced it is when he was agitated and had to sit in a cramped position as in a bus for 30-35 minutes. *Id.*, p. 52.
>
> On that day, a Patient Care Conference was held at WCI between the Plaintiff's medical providers and correctional staff to determine whether his incarceration at WCI was medically appropriate. As a result of the meeting it was determined that it was appropriate to continue the Plaintiff's housing at WCI. It was further determined that when the Plaintiff was to be transported for more than 30 minutes he was to be supplied with Depends or a similar brand of adult diapers and should have a change of pants with him. *McCoy v. Clark*, Civil Action No. WDQ-00-900 (D. Md. 2009). There is no basis for a finding that the Defendants were indifferent to the Plaintiff's medical needs.

*See McCoy v. Correctional Medical Service, Inc.*, WDQ-10-1481 (D. Md), ECF No. 60 (footnotes omitted).

While housed at MCI-J, the Plaintiff filed ARP #0399-09 alleging lack of follow-up appointments and denial of medical devices. The ARP was investigated and dismissed after it was determined the Plaintiff had been scheduled for an appointment with an outside vendor for evaluation of a high top boot but had refused to be seen. After a meeting with medical personnel, the Plaintiff agreed to be referred back to the outside vender for the orthopedic shoe consult, and the appointment was then pending. It was further noted that the Plaintiff had signed for and received a wedge pillow on September 11, 2009. Plaintiff was also advised that his left arm brace sleeve was on back order from the medical supply vendor, and he would receive the brace when medical staff received it. It was noted that the Plaintiff was scheduled for an off-site dental surgery appointment in July of 2009; however, the oral surgeon postponed the surgery and the appointment to reschedule was pending. ECF No. 30, Ex. 8.

On August 30, 2009, the Plaintiff filed ARP MCI-J #0473-10 complaining he was being harassed by Major Wilson and Officer White. He withdrew the ARP on September 22, 2009. *Id.*, Ex. 10.

12

On December 17, 2009, the Plaintiff submitted ARP MCI-J #0667-09, complaining of lack of treatment for his jaw complaints and failure to receive orthopedic shoes. *Id.*, Ex. 9. The ARP was investigated and dismissed. The investigation revealed that Hanger Orthotic, the vendor previously scheduled to evaluate the Plaintiff had terminated their relationship with the Plaintiff for all their stores. It was further noted that the Plaintiff was referred back to dental for his evaluation of his jaw complaints and had been seen by orthopedics for his complaints concerning his right knee. The Plaintiff was advised that arm sleeves were available in the institution for use under his arm brace. *Id.*

On January 11, 2010, the Plaintiff was transferred to WCI. Lt. Gordon avers that he was the Housing Unit Manger of the Plaintiff's housing unit, HU#2. *Id.*, Ex. 11. He avers that neither he nor his staff threatened to place the Plaintiff on segregation in retaliation for his having filed complaints. Gordon further avers that medical appointments are scheduled by the medical department at WCI, and medical staff makes arrangements for inmates to attend the appointments. Custody staff has no control or authority over the scheduling of medical appointments unless a security/safety issue is involved. Gordon avers that neither he nor his staff denied Plaintiff an appointment that medical staff may have arranged with a neurologist. Gordon further avers that HU#2 is a general population unit, and inmates have access to showers seven days a week. Gordon avers that neither he nor his staff denied showers to the Plaintiff. Gordon also avers that had the Plaintiff been provided with a medically ordered shower chair neither he nor his staff would have denied the Plaintiff access to same. *Id.*

Tenille Winters, Case Management Specialist II/Assistant Litigation Coordinator for WCI, avers that there is no record of the Plaintiff having a conversation with former Warden Morgan in

13

March 2010, or at any other time during his incarceration at WCI, regarding the Plaintiff's medical care.[4] *Id.*, Ex. 12.

In ARP WCI #0585-10, the Plaintiff mentioned he suffered hearing impairment and complained he had been denied a phone for the hearing impaired. *Id.* WCI is not equipped with a TTY phone. Defendants maintain that the Plaintiff is not completely deaf and does not meet the criteria for use of a TTY phone. *Id.* He did not appeal the dismissal of the ARP.

Defendants indicate that WCI is a double cell institution which has wheelchair accessible cells but does not have medical housing cells in general population. If an inmate's medical needs warrant medical housing, the infirmary is utilized. The decision to house an inmate in the infirmary is made by a physician, not by correctional staff or at the request of an inmate. WCI's HU#1 is a general population unit with wheelchair accessible cells. The Plaintiff does not use a wheelchair. On February 11, 2010, the Plaintiff was moved to HU#2 in compliance with medical staff's recommendation that Plaintiff be moved closer to the medical department. He was not moved to HU#1 as there was no available bed space in that unit. *Id.*

Winters avers that there is no record of the Plaintiff being housed in a cell with a broken window, nor is there any record of the Plaintiff filing an ARP regarding a broken cell window. *Id.*

Winters further avers that on January 25, 2010, the Plaintiff was placed on administrative segregation for a 120 hour review after DPSCS had received a letter from the Plaintiff's sister indicating his life was in danger. *Id.*, Exs. 12-15. The Plaintiff was placed on administrative segregation so that the alleged threats to the Plaintiff's safety could be properly investigated. During the investigation, Case Manager Crowe advised Acting Assistant Warden Tichnell that

---

[4] The Court finds the lack of such a record unpersuasive as to whether the conversation occurred.

14

Plaintiff used a walker, not a wheelchair, and noted that the Plaintiff had advised Crowe he needed to be housed closer to Baltimore to facilitate his transportation to his frequent court and medical appointments. The Plaintiff further advised that he was incontinent which made the long transport difficult. Crowe further reported that none of the housing unit officers was aware of any threats against the Plaintiff. Crowe opined that the Plaintiff was using the alleged threats to manipulate his housing to expedite a transfer from WCI. Crowe further reported she did not receive any notes from the Plaintiff, nor had he approached her, or any other custodial staff member, to advise them of the alleged threats. *Id.*, Ex. 12.

The administrative segregation unit was then located in HU#5. Inmates are assigned to the next available cell when their housing status changes unless there is a contrary order from the medical department. Plaintiff's only medical order was that he be assigned a bottom bunk. He did not have a medical order to be housed on a bottom tier. While housed on administrative segregation, an inmate's movement is limited to ensure the safety of the inmate and the institution. A medical department is located on the segregation unit to address medical needs of the inmates housed there. Additionally, inmates housed on segregation are fed in their cells. Recreation is provided to administrative segregation inmates in outdoor recreation areas; however, inmates may refuse to participate in recreation. The Plaintiff was removed from administrative segregation status on January 29, 2010, after he informed staff that he had not been threatened as previously alleged and signing a waiver stating he did not have any enemies at WCI. *Id.*, Ex. 12.

WCI's ARP Coordinator, Jeffrey Shimko, avers that all ARP forms received by the ARP office are logged and investigated per DPSCS directives. *Id.*, Ex. 16. Shimko avers that the Plaintiff did not file an ARP regarding a broken cell window while housed at WCI. Plaintiff's

15

ARP WCI#0585-10 mentioned a hearing impairment, but the ARP mostly concerned housing. *Id.*, Exs. 16-17.

The Plaintiff's ARP filed on January 12, 2010, ARP WCI #0253-10, requested a transfer and was procedurally dismissed as inmates may not seek relief through the ARP process for case management decisions. *Id.*, Exs. 18-19. In dismissing the ARP Warden Morgan advised the Plaintiff that he did not then have any medical appointments or procedures scheduled in the Jessup area and noted there were adequate health care facilities in Cumberland if needed. *Id.*

The Plaintiff's ARP WCI #0580-10, filed in February 2, 2010, seeking transfer to HU#1 (the medical unit) was dismissed as moot because he had been transferred to HU#2.[5] The Warden determined that the complaints had been rectified by his transfer to HU#2 which greatly shortened his route to education, medical and the dining hall. *Id.*, Ex. 20. The Plaintiff's appeal of the dismissal to the Commissioner was also dismissed, with a notation that the Warden had fully addressed the Plaintiff's complaint. The appeal response also noted that the Plaintiff had been moved to HU#2 thus placing him closer to the education building, medical department, and inmate dining hall. *Id.*

The Plaintiff's ARP WCI # 0585-10, filed on February 15, 2010, was dismissed because it was ambiguous. *Id.*, Ex. 21. In dismissing the ARP, Warden Morgan noted that it appeared the Plaintiff was seeking to move his housing to HU#1 for easier access to the medical department, but the issue had been resolved by moving the Plaintiff to HU#2. The Plaintiff was further directed to submit a request to be moved to HU#1 to Lt. Whiteside, but was advised that

---

[5] The Plaintiff attached to his appeal the recommendations from Dr. Mickel dated February 17, 2010, indicating that the Plaintiff "needs access to the medical unit in a single cell, building 1 due to his many medical....needs cell with a seat and railing. Daily medical showers." *Id.* On February 3, 2010, Dr. Ottey recommended lower bunk status for one year, a transfer to a housing unit close to the medical building and a transfer to HU#1 due to the Plaintiff's medical conditions. ECF No. 32, Attachments.

consideration of such a request would be based on availability of housing and medical necessity. The ARP was alternatively dismissed as repetitive to ARP WCI #0580-10. *Id.*

The Plaintiff's ARP submitted on February 16, 2010, ARP WCI #0586-10, was dismissed pending resubmission as it contained multiple issues. *Id.*, Ex. 22. Plaintiff failed to resubmit the ARP as directed.

ARP WCI #0906-10, filed on April 25, 2010, was also dismissed as repetitive. It was noted that the multiple issues were previously resolved in ARPs WCI #0253-10, #0274-10, #0585-10, #0582-10, and #0580-10. *Id.*, Ex. 23. Plaintiff's appeal was dismissed as repetitive and final at the Headquarters level on May 18, 2010. *Id.*

On April 30, 2010, the Plaintiff was transferred to RCI. *Id.*, Exs. 2 & 25. Lt. Munson avers that he made no attempt to block, interfere with, or hinder in any way, the Plaintiff's ability to receive legal papers or gain access to the courts. *Id.*, Ex. 26. Munson avers that paperwork belonging to the Plaintiff was held in the Receiving and Identification area at RCI because the Plaintiff refused to permit Munson to inspect the paperwork to ensure that it consisted of legal documents. Munson avers that he advised the Plaintiff that the paperwork needed to be inspected and that the Plaintiff would need to advise Munson which papers pertained to pending or open cases. Plaintiff responded that all of the papers pertained to open cases and refused to permit Munson to inspect the paperwork. Munson advised the Plaintiff that he could not allow the Plaintiff to take the box until Munson was able to properly inspect the contents of the box. Munson advised the Plaintiff that if he needed any paperwork in the box to contact him, and he would allow the Plaintiff, in his presence, to go through the box. *Id.* Property records show that Plaintiff had excess property, including paperwork. *Id.*, Ex. 27.

Lt. Winters avers that at the request of medical personnel, he confiscated the Plaintiff's cane while Plaintiff was housed at RCI. *Id.*, Exs. 28 & 29.

On May 18, 2010, the Plaintiff's case management team placed him on a transfer list to any medium security institution. *Id.*, Ex. 25. On May 20, 2010, the Plaintiff's sister called RCI and spoke with Brian Bell in case management to inquire as to the Plaintiff's inability to use the phone. Bell advised that the Plaintiff had not complained to him about use of the phone and if he had an issue he needed to write to the telephone representative. The Plaintiff's sister told Bell that she had placed money in his account, and he should be able to use the phone. Bell explained that the case management department was not responsible for issues pertaining to the phone. Notes further reflect that the Plaintiff's attorney phone call scheduled for June 29, 2010, was cancelled by the attorney's secretary who advised the call was not necessary as the Plaintiff had spoken with his attorney the preceding day from the tier phone. *Id.*

The Plaintiff filed three ARPs while housed at RCI relevant to his complaint of denial of access to his legal materials and access to the phone. ARP RCI #0611-10 filed on May 15, 2010, complained about the Securus/T-Netix Phone System and money deposited into this account. The ARP was dismissed because phone system complaints are not within the jurisdiction of the DOC but must be directed to the phone system provider. *Id.*, Ex. 30. The Plaintiff was, however, provided a Securus/T-Netix complaint form. *Id.* ARP RCI #0621-10, filed on May 17, 2010, sought transfer to a medium security institution in the Jessup region and was dismissed as repetitive of ARP RCI #0572-10. *Id.*, Ex. 31. In ARP RCI #0796-10, filed on June 6, 2010, the Plaintiff complained that his Bose wave radio was confiscated upon his arrival at RCI. The ARP was dismissed because the Bose radio was not within the allowable property at RCI. *Id.*, Ex. 32.

The Plaintiff's appeal was dismissed and he was advised that the Allowable Property Matrix stated that after March 1, 1998, the only allowable radio was a Walkman type.[6] *Id.*

On July 7, 2010, the Plaintiff was transferred to MCI-J. *Id.*, Exs. 2 & 25. Before his transfer, his property was inventoried, and the Plaintiff signed the property inventory on the date of transfer. *Id.*, Ex. 33. Since his return to MCI-J, the Plaintiff has been able to telephone his attorney and/or the court. *Id.*, Ex. 25.

The Plaintiff filed two grievances with the IGO in April of 2010. *Id.*, Ex. 34. IGO No. 20100682, filed on April 8, 2010, was an appeal from the disposition of ARP WCI #0253-10, regarding his request that he be given a medical transfer to a medium security facility in the Baltimore/Jessup area. The grievance was dismissed on April 19, 2010. There is no indication that Plaintiff sought judicial review of that decision.

IGO No. 20100683, also filed on April 8, 2010, was an appeal from the disposition of WCI #0274-10 concerning the Plaintiff's complaint of the long transport from Cumberland to medical providers in Baltimore. The Plaintiff noted that during his transport he sometimes became incontinent. The complaint also concerned the temporary accommodations he was provided in the Baltimore/Jessup area which did not meet his medical needs. On May 27, 2010, the grievance was dismissed as moot as the Plaintiff had been transferred from WCI in Cumberland to RCI in Hagerstown, shortening the distance for medical transport. It was also noted the Plaintiff had been provided Depends adult diapers and a change of pants to be used for any transport exceeding half an hour. *Id.*

---

[6] The relevant Division of Correction Directive provides, however, that an inmate then in possession of a radio outside the new guidelines would be permitted to keep the radio until it could no longer be repaired. The Plaintiff has provided documents that security at MHC approved his receipt and retention of the Bose radio. ECF No. 32, Attachments.

The Plaintiff released his claims about his transfers in 2010 from MCI-J to WCI and from WCI to RCI in the settlement agreement reached in *McCoy v. Clark*, Civil Action No. WDQ-00-900, ECF No. 124. *Id.*, Ex. A.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (*quoting* Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

20

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Analysis

### Transfers

The Plaintiff has released his claims regarding the transfers occurring in 2010 in a settlement agreement reached in another matter. *See McCoy v. Clark, et al.*, Civil Action No. WDQ-00-900, Settlement and Agreement, Exhibit A at ¶3(ii). It is well-settled that a person may forfeit his right to file a civil rights lawsuit in an enforceable release. *See Town of Newton v. Rumery*, 4880 U.S. 386, 107 S. Ct. 1187 (1987). When parties enter releases that are "voluntary, deliberate, and informed" the settlement agreements are entitled to be enforced. *Bushnell v. City*

*of Baltimore*, 750 F.2d. 298, 302 (4th Cir. 1984), (*quoting Jones v. Tabler*, 648 F.2d 1201, 1203 (9th Cir. 1981)).

Moreover, it is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest). The Plaintiff does not have a right to be housed in a particular prison or participate in a particular program, and these allegations are therefore subject to dismissal.

Failure to Exhaust

The Defendants maintain that the Plaintiff's complaints regarding access to the TTY and conditions of confinement claims should be dismissed for failure to exhaust administrative remedies. ECF No. 30. The Court agrees. In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. The Division of Correction's Directive on Administrative Remedy Procedures, DCD # 185-002 (August 27, 2008) outlines the ARP process. The ARP must be filed within 30 days of the date on which the incident occurred, or 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. DCD # 185-002, § VI. L.3. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. DCD # 185-002, VI. M.1. If the appeal is denied, the prisoner has 30 days to file a grievance with

22

the Executive Director of the Inmate Grievance Office. *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code Title 12 § 07.01.03; *see also* DCD # 185-002, §VI.N.1. To show administrative exhaustion, the Plaintiff must demonstrate that he appealed his grievance all the way to the Inmate Grievance Office through all three steps in the administrative process.

There is no evidence that the Plaintiff exhausted the grievance process regarding alleged denial of access to TTY services[7] or broken cell windows. ECF No. 30, Exs. 7 & 16. The Plaintiff has provided the Court hundreds of pages of ARPs, ARP appeals and IGO correspondence (ECF No. 32, Attachment), none of which refute the Defendants' contentions, and much of which is irrelevant to the present proceedings and or duplicative.

## Respondeat Superior

The Plaintiff's complaint against Maynard, Stouffer, Filbert, Morgan, Hershberger, Koppel and Corcoran is based solely upon the doctrine of *respondeat superior,* which does not apply in §1983 claims. *See Love-Lane v. Martin,* 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh,* 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed

---

[7] In ARP WCI#0585-10, the Plaintiff mentioned his hearing impairment and request for use of a "hearing impaired phone." He also requested a change in housing to a medical unit. The ARP was dismissed as moot due to "ambiguous content." His complaint regarding his medical housing was noted to have been remedied by his move to HU#2, and he did not appeal the decision. Similarly, WCI ARP #090610 included general complaints about denial of access to a phone for the hearing impaired, however, the ARP contained numerous complaints, including most of those contained in the instant complaint; e.g., denial of adequate medical care, denial of medial unit housing, first floor housing, and housing closest to the medical unit. The ARP was dismissed as repetitive of previously filed ARPs. The Plaintiff did not appeal. *Id.* The Plaintiff complained at RCI that someone was putting his ID number in the phone. He was directed to submit a complaint to Securus/T-Netix. *Id.*, Ex. 30.

The Plaintiff filed ARP WCI#0779-10 about his temporary housing at MCAC. The ARP complained that he was not housed in a handicapped accessible cell. It did not pertain to the open window and related matters. ECF No. 32, Attachments. The ARP was investigated, and it was determined that when the Plaintiff was transferred to MCAC all of the handicapped accessible cells were in use, and he could not be accommodated.

23

to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), (*citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Plaintiff has shown no action or inaction by Defendants Maynard, Stouffer, Filbert, Morgan, Hershberger, Koppel or Corcoran that resulted in a constitutional injury, and accordingly, his claims against them will be dismissed.

Medical Care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S.294, 297 (1991)). To state an Eighth Amendment claim for denial of medical care, a Plaintiff must demonstrate that the actions of the Defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner Plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837

24

(1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer,* 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center,* 58 F. 3d 101, 105 (4th Cir. 1995) (*quoting Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2000); (*citing Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The Plaintiff's allegations that the Defendants interfered with the provision of medical care are belied by the record. The Plaintiff has been provided extensive medical care for his numerous complaints. His transfer to WCI was occasioned by the decision of his medical providers that his needs could be better managed there because of the availability of medical cells, a neurologist on staff, and more extensive physical therapy, not, as the Plaintiff alleges, because of retaliation by correctional employees. The record demonstrates, as the Court has recounted,

that numerous delays in treating the Plaintiff's medical concerns were occasioned by his own conduct. Moreover, the Plaintiff has failed to demonstrate any injury from the alleged interruption or delay in medical care.

The record demonstrates that upon his transfer to WCI there was no bed space available in HU#1, the unit equipped with wheelchair accessible cells. The Plaintiff did not use a wheelchair, and the decision to house him in HU#1 was to be based on availability and medical necessity. Given the lack of bed space, he was housed on HU#2. HU#2 was next closest to dining, education and medical facilities. HU#2, as a general population unit, also permitted the Plaintiff daily access to showers. To the extent the Plaintiff was housed at times on an upper tier, there was no medical order that the Plaintiff be housed on the bottom tier. The Plaintiff did possess at various times medical orders that he be single celled and medical personnel requested that he be housed as close as possible to the medical department.[8] Such recommendations are naturally subject to security concerns and availability of the requested housing. The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977) (emphasis added).

The Plaintiff's claim that his cane was improperly confiscated at RCI also fails to establish a constitutional violation. There is no dispute that the cane was confiscated nor is there any

---

[8] The Plaintiff has presented documents showing that in 2006 and 2007 it was recommended he be housed in a single cell. He has also provided a medical report for inmate assignments dated March 31, 2010, which indicates his single cell and daily shower orders were cancelled. ECF No. 32, Attachment. He disputes the authenticity of this form and provided another form dated April 6, 2010, ordering single cell housing permanently. *Id.*

There is no doubt from the medical records before the Court that the Plaintiff's medical providers did not always agree on the treatment plan for the Plaintiff and were at times in direct conflict; e.g., Dr. Tesfaye's belief that WCI could best accommodate the Plaintiff and Dr. Mickel's disagreement with that determination and recommendation that the Plaintiff be returned to the Jessup region. In February, 2010, Dr. Mickel recommended single cell status while Dr. Ottey did not. ECF No. 32, Attachments.

dispute that the Plaintiff had a medical order to use the cane and also had access to a walker. Winters, however, avers that he confiscated the cane at the direction of unnamed medical staff. In light of Winters' averment, he cannot be said to have acted with deliberate indifference to the Plaintiff's legitimate medical need. Rather, Winters reasonably believed he was acting in accordance with medical instructions.[9]

In sum, the Plaintiff has been evaluated repeatedly and provided appropriate medical treatment; there is no evidence that the Defendants interfered with the provision of his medical care.

## Americans with Disabilities Act (ADA)/Rehabilitation Act (RA) Claims

To establish a prima facie case under Title II of the ADA, the Plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of his disability. *See Constantine v. George Mason Univ.,* 411 F.3d 474, 498 (4th Cir.2005); *Baird v. Rose,* 192 F.3d 462, 467 (4th Cir.1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131 et seq. A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade County,* 480 F.3d 1072, 1082 (11th Cir.2007).

---

[9] Plaintiff concedes he did have access to his walker, but argues that the cane was preferable to a "standard walker" (ECF No. 32, p. 11) and avers that he fell on several occasions while walking outside with his walker. ECF No. 30.

To the extent the Plaintiff claims that a denial of medical treatment violates his rights under the ADA or RA, his claim fails. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit and published and unpublished cases from other circuits indicate that a prisoner may not state a claim under the ADA or RA for a lack of medical treatment.[10] Moreover, the Plaintiff has failed to establish that he is disabled within the meaning of the ADA or RA, and no evidence demonstrates that the Plaintiff was discriminated against because of a disability. Accordingly, his ADA and RA claims fail.

### Harassment

"[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Accordingly, the Plaintiff's allegations that Defendants Whiteside, Gordon, Toothaker and McCusker threatened him with "lock-up", even if true, fail to state a claim.

### Access to Courts

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v.*

---

[10] *See, e.g. Miller v. Hinton*, 288 Fed. Appx. 901 (4th Cir. 2008) (prison's alleged denial of access to colostomy bags and catheters by inmate, who was a paraplegic confined to a wheelchair who used such supplies for urinary bladder control, did not constitute disability discrimination in violation of ADA absent a showing that inmate was treated in that manner because of his disability); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir.2005) (medical care provided to inmate for his diabetes could not be basis for RA action); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir.2005) (inmate's claims under RA and ADA were properly dismissed for failure to state claim as they were based on medical treatment decisions); *Spencer v. Easter*, 109 Fed. Appx. 571, 573 (4th Cir. 2004) (failure to provide timely refills of prescription drugs did not amount to an ADA violation when there was no showing that it was based on prisoner's disability); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled.").

28

*Smith,* 430 U. S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey,* 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland,* 112 F. 3d 773, 776 (4th Cir. 1997) (*quoting Lewis,* 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis,* 518 U.S. at 349. The Plaintiff has failed to allege any injury resulting from the withholding of his legal materials. The evidence demonstrates that the property was withheld because the Plaintiff refused to consent to inspection by correctional staff upon his transfer. Additionally, the Plaintiff was not denied all access to the material; rather, he was allowed access to his legal materials within the property room, rather than within his cell.

Further, to the extent the Plaintiff alleges he was prohibited from assisting other inmates in preparing their legal materials, his claim fails. When a prison system fails to provide a reasonable alternative of access to court for inmates, the system may not bar inmates from assisting other inmates in preparation of their post-conviction petitions. *See Johnson v. Avery,* 393 U.S. 482, 488 (1969). This does not however, grant the Plaintiff an independent right to serve as a jailhouse

lawyer. *See Thaddeaus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (*citing Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993)); *see also Munz v. Nix*, 908 F. 2d 267, 269 (8th Cir. 1990) (no constitutional right to be recognized and active as a jailhouse lawyer.) Similarly, the Plaintiff is not entitled to maintain a suit for other prisoners' complaints. *See Inmates v. Owens*, 561 F.2d 560 (4th Cir. 1977).

Administrative Remedy Process

To the extent the Plaintiff alleges there were problems with the processing of his administrative remedy requests, his claim fails. Although the long standing rule has been that prisoners have no constitutional right to participate in an institutional grievance procedure, *see Adams v. Rice*, 40 F. 3d 72, 75 (4th Cir. 1994), with the passage of the Prison Litigation Reform Act (the "PLRA"), 42 U.S.C. § 1997e(a), the issue is less clear. The PLRA requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner. The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further clarification regarding exhaustion as a pleading requirement was announced by the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), wherein the court held, "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Id.* at 681. To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct, that evidence may be presented in response to the affirmative defense. *Id.* at 682. Thus, an inability to access the administrative remedy procedure based on an alleged

30

refusal by prison officials to enforce the rules governing the process does not run afoul of the due process clause. Assuming, *arguendo*, that the Defendants did not satisfactorily investigate or respond to the Plaintiff's remedy requests, the Plaintiff's claim fails as he has not alleged, much less demonstrated, any injury as a result of the alleged failure to investigate ARPs.

State Policies

To the extent the Plaintiff alleges written directives concerning his transfers, allowable property, and/or any other matter, were not followed to the letter, the adoption of procedural guidelines does not create a liberty interest; thus, the mere failure to follow regulations is not a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[11]

Administrative Segregation

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Following the reasoning of the Supreme Court in *Sandin*, the Court finds no liberty violation implicated in the decisions associated with the Plaintiff's placement on administrative segregation, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). The Plaintiff was placed on administrative segregation because his sister had contacted the facility and advised that the Plaintiff was in danger. The Plaintiff was moved to administrative segregation so those claims could be investigated. No evidence of a threat was uncovered, and he eventually advised staff that he was not threatened and had no known enemies at the institution. When the investigation

---

[11]Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

was complete, the Plaintiff was removed from administrative segregation. Although the Plaintiff portrays the decision to move him to administrative segregation as a punitive one, clearly it was not. Rather, the decision to move Plaintiff was for his benefit and safety. The Court finds nothing in the record which shows that the Plaintiff's assignments to administrative segregation were the atypical hardships contemplated by *Sandin* or *Beverati*. Therefore, the assignment does not implicate a liberty interest.

Retaliation and Conspiracy

The Plaintiff claims that all the Defendants conspired to violate his constitutional rights. To establish a civil conspiracy under § 1983, the Plaintiff must present evidence that the Defendants acted in concert and that some overt act done in furtherance of the conspiracy resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir.1996). An essential element for a claim of conspiracy to deprive the Plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006-07 (4th Cir.1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). The Plaintiff must allege facts establishing that the Defendants shared a "unity of purpose or a common design" to injure him. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). To prevail on a claim of retaliation, the Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir. 1987) (*quoting Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King,*

918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusionary allegations of retaliation insufficient to state claim).

Here, the Plaintiff alleges the Defendants conspired to transfer him among various facilities in retaliation for his having filed ARPs and state and federal complaints. The Plaintiff's claim is contradicted by the Affidavit of Dr. Tesfaye who averred that the Plaintiff's transfer was occasioned by the decision of medical staff that his medical needs could be better addressed at WCI. *See McCoy v. Clark*, Civil Action No. WDQ-00-900 (D. Md. 2000), ECF No. 115, Exs. 3 & 4. That the determination was later changed, and the Plaintiff was returned to the Jessup area does not undermine the finding that the correctional Defendants did not conspire to retaliate against the Plaintiff. Plaintiff offers nothing in support of his claim other than self-serving averments. The record contains no evidence that Defendants acted in the manner alleged.

Moreover, to state a claim that an adverse action was taken in retaliation for the exercise of a protected constitutional right, the Plaintiff must prove that retaliation was the "actual motivating factor." *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979). This amounts to a "but for" test. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995); *Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir. 1991); *Collinson v. Gott*, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); *McDonald*, 610 F.2d at 18-19. As noted, the record demonstrates that the Plaintiff was transferred because the Plaintiff's medical providers believed his care could be better managed at WCI. The record also contradicts the Plaintiff's claims that correctional employees conspired to interfere with his receipt of medical care. Mere allegations of a conspiracy are insufficient to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (unsupported claim of conspiracy to issue false disciplinary reports fails to state claim); *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988) ("Allegations of conspiracy . . . must be pled with

sufficient specificity and factual support to suggest a meeting of the minds.") (quotation omitted);

*Langworthy v. Dean*, 37 F. Supp.2d 417, 424-25 (D. Md. 1999).

## Conclusion

For the reasons stated above, summary judgment will be granted to the Defendants.

Date: 8/15/13

William D. Quarles, Jr.
United States District Judge